IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| FRANCISCO ANTONIO GOMEZ MUNOZ, §<br>#30100-510, §<br>MOVANT, §<br>§<br>v. §<br>§<br>UNITED STATES OF AMERICA, §<br>RESPONDENT. § | CIVIL CASE NO. 3:24-CV-811-E<br>(CRIMINAL CASE NO. 3:22-CR-442-E) |

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b), the fourth ground in Movant Francisco Antonio Gomez Munoz's *pro se* motion under 28 U.S.C. § 2255 to vacate sentence was referred to the United States Magistrate Judge for an evidentiary hearing and for entry of findings, conclusions, and recommendation. Doc. 12; Doc. 1 at 8. The Court subsequently held an evidentiary hearing on Munoz's claims that defense counsel provided ineffective assistance for failing to file a notice of appeal as instructed by Gomez and for failing to consult with Gomez about an appeal. Upon careful review of the relevant pleadings, the record, and the applicable law, the Court concludes that Gomez should be **GRANTED** an out-of-time appeal.

I. BACKGROUND

In 2023, pursuant to a plea agreement, Gomez pleaded guilty to conspiracy to possess with intent to distribute a Schedule II controlled substance. Crim. Doc. 27.[1] The Court subsequently sentenced him to life imprisonment. Crim. Doc. 43. Although Gomez did not file

---

[1] All "Crim. Doc." Citations refer to the related criminal case, *United States v. Gomez*, No. 3:22-cr-442-E-1 (N.D. Tex. Oct. 4, 2023). All "Doc." Citations refer to this § 2255 case.

a direct appeal, he timely filed this § 2255 motion. He alleges his trial counsel rendered ineffective assistance by failing to (1) file a notice of appeal as he and his family had requested and (2) consult with him regarding an appeal. Doc. 1 at 8. On March 4, 2024, an evidentiary hearing was held to address his claims. Doc. 28.

## II. APPLICABLE STANDARD

The Sixth Amendment guarantees reasonably effective assistance of counsel at all critical stages of a criminal proceeding. *See Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980). To obtain post-conviction relief on a claim that defense counsel was constitutionally ineffective, a defendant must prove that counsel's representation "fell below an objective standard of reasonableness" and that any such deficiency was "prejudicial to the defense." *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984). Failure to establish either deficient performance or prejudice defeats the claim. *Id.* at 697.

In *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000), the United States Supreme Court applied the *Strickland* test to claims "that counsel was constitutionally ineffective for failing to file a notice of appeal." The Supreme Court reaffirmed the well-settled rule that "a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." *Flores-Ortega,* 528 U.S. at 477 (citations omitted); *see also Garza v. Idaho*, 586 U.S. 232, 242 (2019) ("Where . . . a defendant has expressly requested an appeal, counsel performs deficiently by disregarding the defendant's instructions."). Under such circumstances, "prejudice is presumed 'when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken'" and "'no further showing from the defendant of the merits of his underlying claims'" is required. *Garza,* 586 U.S. at 235 (quoting *Flores-Ortega*, 528 U.S. at 484); *United States v. Tapp,* 491 F.3d 263, 265-66 (5th Cir.

2

2007) (finding the defendant need only show "a reasonable probability that, but for counsel's failure, he would have timely appealed"). This "presumption applies even when the defendant has signed an appeal waiver." *Garza*, 586 U.S. at 237; *see also Tapp*, 491 F.3d at 266.

But even where a defendant does not instruct counsel to file an appeal or clearly convey his desire to appeal, counsel has a constitutional duty to consult with the defendant about an appeal. *Flores-Ortega,* 528 U.S. at 480. Such a duty arises "when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.* In this context, consulting means "advising the defendant about the advantages and disadvantages of taking an appeal[] and making a reasonable effort to discover the defendant's wishes." *Id.* at 478; *United States v. Pham*, 722 F.3d 320, 323-24 (5th Cir. 2013). "The existence of a duty to consult is assessed in light of 'all the information counsel knew or should have known.'" *Id.* at 324 (quoting *Flores-Ortega*, 528 U.S. at 480). "Whether the conviction followed a trial or a guilty plea is 'highly relevant,' although not determinative, as is whether the defendant waived his right to appeal and whether he received a sentence for which he bargained." *Id.* The Supreme Court also anticipated that "district courts would find a duty to consult 'in the vast majority of cases.'" *Id.*

In the event counsel does not meet the constitutionally imposed obligation to consult, whether prejudice resulted again turns on whether the defendant can "demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Flores-Ortega*, 528 U.S. at 484. This is a fact-intensive inquiry and "evidence that there were nonfrivolous grounds for appeal or that the defendant in question promptly expressed a desire to appeal will often be highly relevant" in

3

determining whether he would have timely appealed but for counsel's deficient failure to consult. *Id.* at 485. Although "the performance and prejudice prongs may overlap, they are not in all cases coextensive," and, as before, the defendant need not "demonstrate that his hypothetical appeal might have had merit[.]'" *Id.* at 486; *United States v. Bejarano*, 751 F.3d 280, 285 (5th Cir. 2014) (per curiam).

### III. EVIDENTIARY HEARING

Gomez, his trial counsel, Alberto Herrera, and Gomez's four siblings—Maria Gomez, Ramon Gomez, Jorge Gomez, and Juanita Munoz—testified at the evidentiary hearing. Doc. 28.

#### A. Gomez's Testimony

Gomez testified that he cannot read or write in English, but entered into the plea agreement based on his understanding that the government had offered him the best deal possible and that his sentence would not be more than ten years. Doc. 28 at 60; Doc. 28 at 66. He stated that Herrera did not explain to him his right to appeal or the appeal waiver provision in the plea agreement, and stated that he (Gomez) was likely confused when he falsely confirmed otherwise at rearraignment. Doc. 28 at 65-66, 73. Gomez also testified that Herrera visited him at FCI Seagoville four days before sentencing to review the Presentence Report (PSR), but claimed that Herrera did not translate the PSR into Spanish and told him for the first time during that visit that he was facing 20-25 years imprisonment. Doc. 28 at 62-63.

Gomez further testified that Herrera did not visit him the day of the sentencing hearing, and that after Judge Brown imposed a life sentence, Gomez asked Herrera, while both were still at counsel table, "what he was going to do," to which Herrera responded, "I'll see you upstairs." Doc. 28 at 66-67. According to Gomez, Herrera did not visit him after sentencing, however, or send him any written correspondence or a copy of the judgment. Doc. 28 at 67-68.

4

Gomez testified that he did not know that he had a limited right to appeal, and did not remember Judge Brown mentioning it. Doc. 28 at 66-67. He also averred that before sentencing, Herrera did not mention whether a notice of appeal would be filed. Doc. 28 at 66. According to Gomez, once he was back at Seagoville FCI after sentencing, he learned from another inmate that he could appeal his sentence, so he immediately called Maria and told her to contact Herrera and ask him to file an appeal. Doc. 28 at 68-69. Gomez further testified that he later met an inmate while being transferred to a Bureau of Prisons (BOP) facility in California, who gave him the contact information for Jesus Arriola (a former prisoner and non-lawyer), who could file an "appeal" on his behalf—information that Gomez subsequently shared with his family. Doc. 28 at 69. Gomez testified that by that point, he knew Herrera was not going to file an appeal on his behalf. Doc. 28 at 69. Gomez stated that Arriola subsequently prepared the instant § 2255 motion, which Gomez claimed he signed without reading it. Doc. 28 at 74-75.

### B. Siblings' Testimony

Called as witnesses by the defense, Gomez's siblings generally corroborated his version of the events. All four testified to being present at the October 3, 2023, sentencing hearing and to, essentially, being shocked by the imposition of a sentence of life imprisonment. Doc. 28 at 6-7 (Maria); Doc. 28 at 33 (Ramon); Doc. 28 at 39 (Jorge); Doc. 28 at 50-51 (Juanita).[2] Each further testified to visiting with Herrera in the hallway immediately after the sentencing hearing, when, according to Maria, she asked Herrera to file an appeal, to which Herrera replied that they had one year to appeal and that he would do so. Doc. 28 at 7-8 (Maria). Ramon and Jorge

---

[2] The Court notes this is consistent with defense counsel's statement at sentencing that "the entire court is full of [Gomez's] family," Crim. Doc. 47 at 10, and the Court's subsequent admonishment to unidentified spectator(s) immediately upon pronouncing the life sentence, "[i]f you need to collect yourself, please step out" (followed by a "brief interruption"), Crim. Doc. 47 at 26.

5

testified that Herrera assured them that it was not over and that he would work with the DEA and the prosecutor to secure a reduced sentence. Doc. 28 at 33-34 (Ramon); Doc. 28 at 39-40 (Jorge).

    Maria further testified that on the afternoon of the sentencing hearing, Gomez called her from FCI Seagoville and said that he wanted to appeal and requested her to ask Herrera to appeal. Doc. 28 at 9-10 (Maria); Doc. 28 at 51-52 (Juanita). According to Maria, on October 9, 2023, Maria and her siblings met Herrera at his office and informed him that Gomez wanted to appeal. Doc. 28 at 10, 12-14 (Maria); Doc. 28 at 40-42 (Jorge); Doc. 28 at 52 (Juanita). According to the siblings, because Herrera reiterated that they had a one-year window to appeal, they left Herrera's office reassured that he would appeal and also pursue a deal with the DEA. Doc. 28 at 14 (Maria); Doc. 28 at 42-43 (Jorge); Doc. 28 at 53-54 (Juanita).

    Maria further testified that on October 26, 2023, after learning that Gomez was being moved to a BOP facility in California, she again called Herrera's office and was then told by Herrera's assistant that Gomez was "U.S. property" and there was nothing they could do. Doc. 28 at 16-18. Maria testified that it was at that point that she realized Herrera would not appeal. Doc. 28 at 19. Maria confirmed that on November 13, 2023, she paid Arriola $1,999 to file an appeal (the § 2255 motion) for Gomez. Doc. 28 at 22; Hr'g Ex. 4 (Maria's bank statement). On cross-examination, Maria conceded that she wrote a letter dated March 5, 2024, in support the § 2255 motion filed by Gomez in the case, which neither mentioned (1) meeting with Herrera and asking him to file a notice of appeal, (2) negotiation of a DEA deal, nor (3) subsequently retaining Arriola to pursue an appeal. Doc. 28 at 26-28. However on redirect, Maria asserted that her letter did not mention many of the post-sentencing events. Doc. 28 at 29-30.

### C. Herrera's Testimony

Herrera testified on direct examination by Government's counsel that (1) he has been a criminal defense attorney for about 24 years, during which he handled about 10 or 20 federal criminal cases; (2) his general procedure is to speak to clients about their right to appeal; (3) the preparation and filing of a notice of appeal is a simple matter; and (4) when a client indicates a desire to appeal, he files a notice of appeal even if the appeal is meritless. Doc. 28 at 77-79. Herrera added that Gomez's family retained him for this case and, because Gomez spoke "Spanglish," he explained relevant parts of the plea agreement in Spanish for him, including the appellate waiver and the rights that he would be waiving. Doc. 28 at 79-83.

Herrera testified that he met with Gomez four days before the sentencing hearing, at which time he reviewed the PSR with Gomez, in English and in Spanish, and discussed the guidelines range, which was up to life imprisonment.[3] Doc. 28 at 84-85. When asked whether he had advised Gomez his guidelines range was around 20-25 years, Herrera explained that he told Gomez and his family that he hoped for a sentence of "17 to 20 years," but that the guidelines range was "20 to life." Doc. 28 at 85-86. Although Herrera asked Judge Brown to sentence Gomez to 20 years, Herrera said the Judge imposed a life sentence. Doc. 28 at 86-87.

After the sentencing hearing, Herrera testified that he spoke briefly with Gomez in the courtroom about possible cooperation in exchange for a reduced sentence and advised he (Herrera) would follow up with the prosecutor. Doc. 28 at 87-88. Herrera testified that he also met with Gomez's family members in the hallway to discuss what transpired at sentencing and the possibility that Gomez could provide information to the Government that could result in a

---

[3] Herrera appeared to confuse this meeting with the previous interview with the probation officer, testifying that "we answered a lot of questions for probation; federal probation was there. We went over all her questions. Then we talked about the Plea Agreement." Doc. 28 at 84.

sentence reduction. Doc. 28 at 88. Herrera denied that Maria ever asked him to file a notice of appeal. Doc. 28 at 88-90. Herrera averred that if she had, he would have done so after confirming it was Gomez's desire. Doc. 28 at 89.

Herrera also confirmed that Gomez's family members visited him at his office a few days after sentencing seeking ways to help Gomez, but testified that they did not ask him to appeal. Doc. 28 at 89-90. Herrera surmised that family members likely confused the 14-day deadline for filing a notice of appeal with the one-year period for filing a Rule 35 motion. Doc. 28 at 90-91. Herrera admitted that he had no further conversations or meetings with Gomez after sentencing, but that some of Gomez's family members stopped by his office every "couple of days" after sentencing, inquiring if there was any news, which Herrera assumed referred to the matter of cooperation, and that they eventually picked up the case file. Doc. 28 at 91-92.

On cross-examination, Herrera acknowledged that he was admitted to practice in the Northern District in August 2022 and was counsel of record in only two cases—Gomez's criminal case and a civil case—and not the 10 or 20 federal criminal cases he had testified to on direct—and affirmed that he had "never filed a Notice of Appeal to the Fifth Circuit." Doc. 28 at 93-95. Herrera testified that he misspoke during direct examination that the guideline range was 20 to life. Doc. 28 at 101. He clarified the guideline range was simply life imprisonment but that he had hoped for a (below-guidelines) 20-year sentence. Doc. 28 at 101.[4]

Herrera further affirmed that (1) he did not ask Gomez if he wanted to appeal or consult with him about his appeal rights at counsel table, (2) he did not later go to the holdover cell to meet Gomez, (3) he did not write to Gomez to ask him if he wanted to appeal, (4) he did not see

---

[4] The record bears this out that while the statutory imprisonment range was ten years to life, Doc. 47 at 8, the guidelines imprisonment "range" was simply life, Crim. Doc. 36-1 at 1, 14, and counsel argued for a below-guidelines sentence of 20 years, Crim. Doc. 47 at 12.

Gomez after the sentencing hearing, and (5) he had no documentation in his file indicating that Gomez did not want to file an appeal. Doc. 28 at 101, 103-104. Herrera testified that the only time he talked with Gomez about his right to appeal was prior to sentencing and never consulted with Gomez about appealing after the life sentence was imposed. Doc. 28 at 104. When asked if he had explained to Gomez that he had nothing to lose in filing a notice of appeal, Herrera stated that he had informed him only about his right to appeal and did not advise him that a notice of appeal could be withdrawn. Doc. 28 at 104.

## IV. ANALYSIS

"[C]ounsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think . . . that [the] defendant reasonably demonstrated to counsel that he was interested in appealing." *Flores-Ortega*, 528 U.S. at 480. In making this determination, courts consider "all the information counsel knew or should have known." *Id.*

### A. Counsel's Performance Was Deficient

In *Pham*, the Court of Appeals for the Fifth Circuit addressed whether a defendant's post-sentencing statements and demeanor, "when viewed in context, was enough to trigger counsel's constitutional duty to consult with [the defendant] about an appeal." There, defense counsel knew that Pham "had hoped to receive a sentence of probation only," and "[w]hen that hope did not materialize, a visibly upset Pham 'brought up that he was concerned about getting 60 months [the mandatory minimum sentence] and wanted to do something to get less time.'" *Pham*, 722 F.3d at 324-26. Because this was "ample demonstration of Pham's interest in doing something to change the outcome of his sentencing through additional proceedings," the Fifth Circuit held that "the post-sentencing statement to counsel and his demeanor when uttering it"

9

were enough to trigger counsel's constitutional duty to consult with Pham about an appeal. *Id.* at 326.

Likewise, in *United States v. Tighe*, 91 F.4th 771, 775 (5th Cir. 2024), the Fifth Circuit found that counsel's failure to consult with the defendant was unreasonable because a rational defendant would have wanted to appeal, and the defendant reasonably demonstrated his interest in appealing. *Id.* The court explained that one indication that the defendant would be interested in appealing was the fact that he was "shocked" by his sentence. *Id.* The court also noted that counsel did not directly ask the defendant after sentencing if he wanted to appeal and, instead, put the onus on the defendant. *Id.* Considering these circumstances, the court concluded that counsel "neither sufficiently consulted with [the defendant] nor made any effort to obtain his wishes about an appeal after sentencing." *Id.* at 776.

Gomez's case is analogous to *Pham* and *Tighe*. Herrera admitted that he did not consult with Gomez about his appellate rights, contemporaneously with sentencing or after, and never advised Gomez of the advantages and disadvantages of appealing. That Gomez was disappointed that he had not received a lesser sentence is uncontroverted, however. It is telling that Herrera had argued for a 20-year sentence, far below the guidelines range and maximum imprisonment of life, and immediately started discussing with Gomez and his family members how they could seek a reduction in sentence through cooperation after Gomez was sentenced to life imprisonment. Under these circumstances, Herrera should have been at least on notice that Gomez might want to appeal. *Tighe*, 91 F.4th at 775. It is likewise telling that Gomez's family continued to contact Herrera on his behalf in the days following sentencing. Herrera thus had a duty to consult with Gomez about an appeal, that is, to explore the advantages and disadvantages of appealing, and make a reasonable effort to determine his wishes.

Moreover, Herrera's belief that he sufficiently counseled Gomez about the advantages and disadvantages of appealing *before* he signed the plea agreement and entered his guilty plea, did not obviate his duty to consult with Gomez personally about an appeal *after* sentencing. *See Pham*, 722 F.3d at 324 (finding counsel did not sufficiently consult where, at most, "counsel discussed an appeal in the abstract and even then did so only *before* the sentence was pronounced," and, post-sentencing, counsel "neither mentioned the possibility of an appeal at all nor made any effort to discover [the defendant's] wishes in that regard"). Likewise, Herrera's view that Gomez had no real basis for appeal, did not relieve him of the duty to consult with his client. *See Pham*, 722 F.3d at 325 ("[C]ounsel's professional opinion eschewing appeal does not excuse failure to consult altogether."); *Thompson v. United States*, 504 F.3d 1203, 1207 (11th Cir. 2007) ("Simply asserting the view that an appeal would not be successful does not constitute 'consultation' in any meaningful sense.").

Indeed, "the decision to appeal rests with the defendant . . . [and] the better practice is for counsel routinely to *consult with the defendant* regarding the possibility of an appeal." *Flores-Ortega*, 528 U.S. at 479 (emphasis added); *Garza*, 586 U.S. at 240 (noting "'the accused has the ultimate authority' to decide whether to 'take an appeal'" (quoted case omitted)). "The Constitution requires that the client be advised not only of his right to appeal, but also of the procedure and time limits involved and of his right to appointed counsel on appeal." *United States v. Faubion*, 19 F.3d 226, 231 (5th Cir. 1994) (internal quotations and citation omitted). Simply put, "[c]ounsel's duty to a criminal defendant . . . requires more than simply notice that an appeal is available or advice that an appeal may be unavailing." *White v. Johnson*, 180 F.3d 648, 652 (5th Cir. 1999).

11

For the foregoing reasons, the Court concludes that Herrera's failure to fulfill his duty to adequately consult with Gomez following sentencing constituted deficient performance under *Strickland*.

### B. Gomez was Prejudiced by Counsel's Deficient Performance

In light of the testimony at the evidentiary hearing, the Court also finds that there is a reasonable probability that, but for Herrera's deficient failure to consult about appealing, Gomez would have timely appealed. *Flores-Ortega*, 528 U.S. at 484. The uncontroverted testimony establishes that Gomez immediately expressed dissatisfaction with his sentence. As set out *supra*, Gomez asked Herrera about the next step while still seated at counsel table right after sentencing. And in light of Gomez's immediate dissatisfaction, the testimony that Gomez called Maria and asked her to tell Herrera of his desire to appeal and that his family subsequently met with Herrera to convey that desire is plausible. Indeed, it is implausible that Gomez's family members would show up to Herrera's office every "couple of days" after sentencing seeking updates if he had explained that he was only pursuing relief based on cooperation with the Government which could take as much as a year.

Most persuasive, however, is that Gomez received the maximum term of imprisonment possible—a life sentence—which would likely be incentive enough to pursue an appeal regardless of the merit of any potential appellate issues. In other words, he had nothing to lose. *See Tighe*, 91 F.4th at 776. The Court further notes that Gomez and his family had given up on Herrera going forward within mere weeks of sentencing and sought Arriola's help with an "appeal" instead. Again, Gomez need not establish in this proceeding the merit of any potential appellate issues to establish prejudice. *Garza*, 586 U.S. at 235; *Bejarano*, 751 F.3d at 285.

Thus, considering the totality of the circumstances and the reasonable inference that can be drawn from the same, the Court finds that Herrera's deficient performance in failing to consult with Gomez about his appeal rights following sentencing deprived Gomez of an appeal that he otherwise would have taken, thereby establishing prejudice. *Flores-Ortega*, 528 U.S. at 484.

## V. CONCLUSION

Based on all of the foregoing, the Court concludes that Gomez's § 2255 motion has merit, and he should be permitted to file an out-of-time appeal. *See United States v. West*, 240 F.3d 456, 459-60 (5th Cir. 2001). To effectuate the same, Gomez's § 2255 motion should be **DISMISSED WITHOUT PREJUDICE**, and the Clerk of the Court should be directed to: (1) reenter the judgment in Criminal Case Number 3:22-CR-442-E-1, thereby triggering a new deadline to file a notice of appeal in that case; and (2) file a notice of appeal on Gomez's behalf in that case no later than 14 days after the reentry of the criminal judgment.

**SO RECOMMENDED** on April 30, 2025.

_[signature]_
RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of this report and recommendation will be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). An objection must identify the finding or recommendation to which objection is made, state the basis for the objection, and indicate where in the magistrate judge's report and recommendation the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to object to 14 days).